IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DAWN MARIE KNOTT,**                     Case No. 5:18 CV 1226

       Plaintiff,                          Judge Donald C. Nugent

       v.                                  Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

       Defendant.                          REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Dawn Marie Knott ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated May 31, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in May 2015, alleging a disability onset date of January 6, 2014. (Tr. 175-76). Her claims were denied initially and upon reconsideration. (Tr. 106-09, 113-19). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 120). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on April 13, 2017. (Tr. 35-72). On August 2, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 17-29). The Appeals Council denied Plaintiff's request for review, making the

hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on May 31, 2018. (Doc. 1).

### FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1971, Plaintiff was 42 years old on her alleged onset date. *See* Tr. 175. Plaintiff has a tenth-grade education (Tr. 44) and previous work as a fast food manager and cook, and deli cutter/slicer (Tr. 44-47, 67). At the time of the hearing, Plaintiff lived with her father, his wife, and her uncle. (Tr. 43). Her driver's license was expired; she stopped driving six or seven years prior due to anxiety. (Tr. 44). For transportation, Plaintiff relied on her mother, and a ride service. *Id.*

Plaintiff believed she could not work due to her anxiety and inability to handle stress. (Tr. 47). She stated she did not do anything (Tr. 48), and estimated she spent "[a]t least 90%" of each day in her room, including eating meals (Tr. 60).

Plaintiff had a visible tremor at the hearing, which she attributed to anxiety. *Id.* She testified her anxiety was "more controllable" on medication, but the tremors occurred "more or less if [she] feel[s] overwhelmed", such as "being around a bunch of people or noise". (Tr. 49). Plaintiff testified she last left her house two weeks prior to go to the grocery store with her mother. (Tr. 49-50). She did not like going to stores, but "handled it okay." (Tr. 50). She had "a little bit" of difficulty going to doctor's appointments due to not liking being in cars with unfamiliar people. (Tr. 60).

Plaintiff had children and grandchildren, but did not see them often. (Tr. 64-65). She saw her mother several times per week, and spoke with her every day. (Tr. 65). She got along with her father, and spoke to him, but they were not close. *Id.*

2

Plaintiff had not seen her counselor recently, but saw James Tudhope[1] once every three months, and more frequently as needed. (Tr. 51). Later, she explained that she was not going to counseling because she was "not getting much out of it" and "[i]t drain[ed] her too much". (Tr. 62). She described a specific incident during group counseling where other individuals had a verbal confrontation and it caused her to have an anxiety attack. (Tr. 63). Plaintiff had anxiety attacks two or three times per week. (Tr. 63-64). She applied for a job at Walmart, and had an anxiety attack during the interview. (Tr. 65). However, she explained she was more anxious at the ALJ hearing than she was during that interview. (Tr. 66). Plaintiff took a variety of psychological medications; these were prescribed by Mr. Tudhope. (Tr. 51-53).

Plaintiff also saw her family doctor, Gary Machado. (Tr. 53-54). Physically, Plaintiff stated that her back problems limited her ability to work. (Tr. 54). She took 800 milligrams of ibuprofen for her back pain. (Tr. 54-55). Plaintiff testified she had limitations in lifting and bending. (Tr. 55).

Plaintiff described approximately five hours of sleep per night; she napped and watched television during the day. (Tr. 56-57). At least once or twice per week she prepared dinner for her family. (Tr. 57-58). Plaintiff kept her room clean, but did not clean elsewhere in the house. (Tr. 58-59). She did laundry, but did not vacuum. (Tr. 59-60).

Relevant Medical Evidence

*Physical*

An October 2013 lumbar spine showed degenerative changes at L5-S1 with disc desiccation, a small left central disc protrusion, and mild facet degenerative changes in the lower lumbar spine. (Tr. 288). There was no spinal canal, lateral recess, or foraminal narrowing. *Id.*

---

1. The transcript reads "James Thorpe" (Tr. 50), but record reflects that the provider's last name is "Tudhope". *See, e.g.,* Tr. 343-45.

In July 2015, Plaintiff underwent a consultative examination with Brittany Carter, D.O. (Tr. 315-18). Plaintiff reported she lived in a home with sixteen stairs, with which she had difficulty, "yet does not require a mobility assist device." (Tr. 316). On examination, Dr. Carter noted Plaintiff was able to get on and off the exam table without assistance, but was not able to bend and touch her toes. (Tr. 317). Plaintiff's gait was "without ataxia" and she had full strength in her upper and lower extremities and a normal straight leg raise. *Id.* Plaintiff was "slow to lie in a supine position" and was "most comfortable with her knees flexed while in the supine position". *Id.* She had some range of motion limitation in the dorsolumbar spine, and hips. *Id.* Dr. Carter assessed chronic back pain with a remote history of degenerative disc disease and right lower extremity radiculopathy, tobacco abuse, THC use, depression, and anxiety. *Id.* X-rays in July 2015 showed mild multilevel degenerative changes in Plaintiff's lumbar spine. (Tr. 319).

At an August 2015 consultative examination, the psychologist noted Plaintiff had "a slightly impaired gait; otherwise gross motor activity was controlled and unremarkable." (Tr. 327).

In September 2015, Plaintiff saw Michael Walch, M.D., for hip pain. (Tr. 370-85). On examination Plaintiff had tenderness in her right hip and she reported numbness and pain on passive and active range of motion. (Tr. 371). She had full strength in both legs, no swelling, and a "limping" gait, favoring the left leg. *Id.* Dr. Walch assessed hip pain, possibly right greater trochanter bursitis, hand pain, onychomycosis, and tobacco abuse. *Id.* The following month, Plaintiff saw Elise Brady, M.D., with continued right hip pain, as well as chronic back pain worsening over the prior year. (Tr. 358). The back pain was worse with activity, and present at night. *Id.* Dr. Brady noted she was "able to ambulate in the examination room" but that Plaintiff reported she had been "walking differently" to reduce the pain. (Tr. 358, 360). Dr. Brady assessed trochanteric bursitis, for which she prescribed gabapentin. (Tr. 360).

4

In January 2016, Plaintiff saw Gary Machado, M.D., after falling down stairs. (Tr. 547). On examination, Dr. Machado noted Plaintiff had a normal musculoskeletal examination with no joint pain, but complained of muscle pain in both legs and neuropathy in both hands. *Id.* He noted Plaintiff ambulated without difficulty. *Id.* He assessed back muscle spasm, fall, peripheral neuropathy, and tobacco use disorder; he prescribed ibuprofen, and cyclobenzaprine. (Tr. 547-48).

In February 2016, Plaintiff underwent a functional capacity evaluation with physical therapist G. Kurt Swanson, P.T. (Tr. 480-86). Mr. Swanson observed "gait with antalgia noted favoring the right side." (Tr. 481). On examination, he found Plaintiff had normal neck range of motion and strength, and normal range of motion in her upper and lower extremities. (Tr. 485). Plaintiff had reduced strength in her shoulders, back, trunk, and lower extremities. *Id.*

At an emergency room visit the same month for low back pain, on examination Plaintiff was "ambulatory", with full strength in her bilateral lower extremities, and negative straight leg raising. (Tr. 427). She had tenderness to palpation over the right paraspinal muscles of the lumbar spine and decreased range of motion with flexion, extension, and rotation. *Id.* Imaging revealed mild lumbar degenerative changes. (Tr. 436).

At an emergency room visit in May 2016 for an abscess (Tr. 519), Plaintiff had normal range of motion in her back and lower extremities, as well as a normal gait (Tr. 520). Plaintiff returned to the emergency room in July 2016 with right-sided lower back pain and nausea. (Tr. 505). Plaintiff had a normal back range of motion and no back tenderness, as well as a normal lower extremity examination. (Tr. 506). An abdominal and pelvic CT was negative, *id.*; Plaintiff was diagnosed with a kidney infection (Tr. 508). Plaintiff returned to the emergency room later that month with "flu-like symptoms". (Tr. 490). On examination, Plaintiff had, *inter alia*, wheezing, and a normal gait. (Tr. 491). She was diagnosed with a COPD exacerbation. (Tr. 492).

5

At a visit with Dr. Machaco in July 2016, Plaintiff had a normal musculoskeletal examination with no joint pain. (Tr. 545). Plaintiff returned to Dr. Machado in August 2016, reporting her recent emergency room visit and that a chest x-ray revealed a nodule. (Tr. 543); *see also* Tr. 492. On examination, Plaintiff had scattered wheezing, but no respiratory distress; her musculoskeletal examination was normal with no joint pain. (Tr. 543). Dr. Machado ordered a chest CT. (Tr. 544). The following month, Dr. Machado noted the chest CT showed two smaller nodules, and referred her for a pulmonary consultation at her request. (Tr. 541). On examination, Plaintiff had "multijoint pain". *Id.*

### Opinion Evidence – Physical

In July 2015, Dr. Carter opined Plaintiff "would be most suited for a light duty position, such as her managerial work that she previously had and held for a period of years." (Tr. 317).

In August 2015, State agency physician Leon Hughes, M.D., reviewed Plaintiff's records and opined she could perform light work, with some postural and environmental limitations. (Tr. 85-86). In September 2015, State agency physician Maureen Gallagher, M.D., affirmed Dr. Hughes's opinion. (Tr. 98-100).

In February 2016, physical therapist Mr. Swanson opined that Plaintiff should avoid kneeling, crouching, and lifting from floor level; should only "occasionally" stand, walk, reach overhead, forward bend from standing, or lift greater than fifteen pounds overhead; and frequently climb stairs. (Tr. 481, 484).

### Mental

In April 2014, Plaintiff treated with SunCoast Center for post-traumatic stress disorder ("PTSD") and major depression. (Tr. 297-306). Plaintiff reported trauma from childhood and adulthood, and that she was "isolating herself, feeling overwhelmed easily and not completing

work, insomnia and panic attacks." (Tr. 302). She sought care after a panic attack. (Tr. 297, 300). Plaintiff reported a history of psychiatric medication, and "recall[ed] doing well on" Prozac, Zoloft, Vistaril, and Trazodone; however, she had been off medication for the prior year and a half due to financial reasons. (Tr. 297). On examination, Plaintiff was cooperative, with coherent/organized thoughts, and normal thought content. (Tr. 298). Her affect was sad, and she was fidgeting. *Id.* Providers made a plan to include therapy and medication. (Tr. 297, 299). Plaintiff was assigned a GAF score of 49.[2] (Tr. 302).

In April 2015, Plaintiff went to the emergency room with abnormal behavior. (Tr. 464-65). Providers noted her "[p]resentation seems concerning for the possibility of suicidality with psychosis, possibly drug induced". (Tr. 464). Plaintiff was transferred to Portage Path Psychiatric Emergency Services, where she was placed on a 23-hour hold. (Tr. 308-13). Plaintiff presented as cooperative, mildly disheveled, with retarded psychomotor activity, and a normal gait. (Tr. 309). She had a suicidal ideation and intent. *Id.* On discharge, Plaintiff was calm and cooperative, with good eye contact, a depressed mood, and no psychosis. (Tr. 308). Discharge diagnoses were depressive disorder and methamphetamine dependence; she was assigned a GAF score of 50. *Id.*

In May, Plaintiff began treatment with providers at Portage Path Behavioral Health. (Tr. 346-47). Plaintiff was overwhelmed and tearful, but by the end of her appointment, "appeared more relaxed". (Tr. 346). On examination, she had a full affect, cooperative behavior, and an

---

2. A GAF score is a "clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503, n.7 (6th Cir. 2006). A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed., Text Revision 2000) ("*DSM-IV-TR*").

anxious and depressed mood. *Id.* The provider adjusted Plaintiff's medications. (Tr. 347). At her next appointment that month with James Tudhope, M.A., M.S.N., P.M.H.N.P.-BC ("Psychiatric Mental Health Nurse Practitioner – Board Certified"), Plaintiff had a depressed and anxious mood, but was cooperative, with average eye contact, and a full affect. (Tr. 343). Plaintiff had trouble sleeping, and felt like she took "several steps forward, and then several steps backward". *Id.* Mr. Tudhope adjusted Plaintiff's medications (Tr. 344), and noted "[s]table" progress (Tr. 345). At a group program later that month, Plaintiff "began to cry" and "elected to leave the room". (Tr. 342).

At a June 2015 counseling session, Plaintiff had average eye contact, clear speech, cooperative and agitated behavior, appropriate affect, and an anxious and depressed mood. (Tr. 340). The counselor noted this was Plaintiff's second counseling session (and the first since October 2014). *Id.* Plaintiff was "cooperative and polite throughout the session." (Tr. 341).

At the physical consultative examination in July 2015, Dr. Carter noted that Plaintiff "at this time, has not complained on examination of having any said difficulty regarding her depression and anxiety, although she states that this is worse than the sciatica. On examination, she was emotionally stable with a normal affect." (Tr. 317).

In August 2015, Plaintiff underwent a consultative psychological examination with Robert Dallara, Jr., Ph.D. (Tr. 325-29). On examination, Dr. Dallara noted Plaintiff was appropriately dressed, with no bizarre behaviors. (Tr. 327). Plaintiff "describe[d] her mood as depressed", and her affect was "appropriate but tearful at times." *Id.* She "did not display overt signs of anxiety such as fidgeting or trembling" but did "report being nervous most of the time and especially around crowds or if she leaves the house". *Id.* Plaintiff reported memory difficulties. *Id.* She was able to count backwards from twenty to one, say the alphabet, remember five digits forward, and three backward. *Id.* She was unable to count from one to 40 by threes, but "did fair" at serial

8

subtraction. *Id.* Dr. Dallara estimated Plaintiff's intelligence to fall in the low-average range. *Id.* Dr. Dallara diagnosed dysthymic disorder, panic disorder, and PTSD; he assigned a GAF score of 53.[3] (Tr. 328).

Later in August, a Portage Path treatment note indicates Plaintiff ran out of medication two weeks prior, and "relapsed on Crystal Meth 5 months ago". (Tr. 335). The provider noted "[w]hen she has her medication on board she is okay; she has been sluggish since off it." *Id.*

Plaintiff went to the emergency room in October 2015 reporting visual hallucinations. *See* Tr. 440-53. Plaintiff reported she had not been on any illicit drugs for six to eight months, however, she tested positive for amphetamines; she "state[d] she [did not] know how she tested positive". (Tr. 449). Plaintiff was assessed with psychosis, not otherwise specified, rule out substance-induced psychosis, depressive disorder, anxiety disorder rule out PTSD, and polysubstance abuse. (Tr. 451). On discharge, physicians noted she was cooperative with staff, took medications as prescribed, and showed improvement in her mood. (Tr. 440). Her discharge diagnoses were psychosis not otherwise specified, anxiety disorder not otherwise specified and polysubstance abuse. (Tr. 441). Her GAF score on discharge was 40.[4] *Id.*

In October 2015, Plaintiff had a walk-in appointment at Portage Path due to recent visual hallucinations. (Tr. 396). Mr. Tudhope noted she denied continued hallucinations since the hospital discharge. *Id.* Plaintiff reported she tested positive for amphetamines, "however, she states she was only smoking weed—possibl[y] laced weed". *Id.* Plaintiff agreed to continue her medication. *Id.*

---

3. A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR* at 34.
4. A GAF score of 31-40 indicates "some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *DSM-IV-TR* at 34.

On examination, Plaintiff's affect was full, her behavior cooperative and impulsive, and her mood anxious. (Tr. 397).

Plaintiff missed her November 2015 appointment (Tr. 395), and had a walk-in appointment in December (Tr. 391-94). At that time, Plaintiff reported sleep problems, poor appetite, and increased anxiety. (Tr. 391). On examination, Plaintiff's activity and eye contact were average; she had clear speech, full affect, cooperative behavior, and anxious and depressed mood. (Tr. 391-92). Mr. Tudhope adjusted medications (Tr. 392) and noted "[s]table" progress (Tr. 394).

At a January 2016 appointment with Mr. Tudhope, Plaintiff reported weight gain as well as concerns about her depression and anxiety. (Tr. 387). On examination, Plaintiff's activity and eye contact were average, and her speech was clear; she had a full affect, cooperative behavior, and anxious mood. *Id*. Mr. Tudhope again adjusted Plaintiff's medications (Tr. 388) and noted "[s]table" progress (Tr. 390).

At her May 2016 emergency room visit, Plaintiff also had a normal psychiatric examination with normal affect, judgment, insight, concentration, remote and recent memory. (Tr. 521). At her first July 2016 emergency room visit, Plaintiff had a normal affect, normal judgment, and normal insight. (Tr. 506). At her second July 2016 visit, Plaintiff had a normal affect, and poor judgment. (Tr. 491). At visits with Dr. Machado in January, July, August and September 2016, Plaintiff was noted to be in no acute distress, and "pleasant". (Tr. 541, 543, 545, 547).

In September 2016, Plaintiff returned to Mr. Tudhope with a "stable mood with low depression". (Tr. 534). On examination, Plaintiff's activity and eye contact were average, and her speech was clear; she had a full affect, cooperative behavior, and euthymic mood. (Tr. 535). Mr. Tudhope adjusted Plaintiff's medications, *id.*, and noted "[s]table" progress (Tr. 537).

10

At her December 2016 emergency room visit Plaintiff had, *inter alia*, a normal affect and normal judgment. (Tr. 560).

*Opinion Evidence – Mental*

In August 2015, Dr. Dallara opined Plaintiff would be able to understand and apply instructions in a work setting consistent with low-average intellectual abilities. (Tr. 329). He noted that "[e]xcept for leaving her last job due to 'family stress' she did not report a pattern of leaving work due to mental or emotional difficulties", and there was no evidence on examination to suggest impairment to persistence or pace. *Id.* Dr. Dallara opined that "[e]xcept for brief tearfulness, the claimant made an essentially unremarkable social presentation during the examination . . . . However due to her depression and anxiety, she would have some difficulties relating to others including fellow workers and supervisors." *Id.* Similarly, Dr. Dallara noted Plaintiff would have "some difficulties withstanding stress and pressure associated with day-to-day work activity". *Id.*

Also in August 2015, State agency physician Kristen Haskins, Psy.D., reviewed Plaintiff's records and opined Plaintiff had no significant limitations in understanding and memory, or concentration and persistence. (Tr. 87-88). She found Plaintiff was moderately limited socially, specifically in the ability to interact with the public, supervisors, and coworkers. (Tr. 88) ("retains the capacity to perform work which requires superficial interaction with supervisors, coworkers, and the general public."). She also found Plaintiff moderately limited in her ability to respond appropriately to changes in the work setting and ability to set goals or make plans independently. *Id.* Specifically, she could "adapt to routine changes in the workplace with moderate time and production demands." *Id.* In October 2015, State agency physician Paul Tangeman, Ph.D., reviewed Plaintiff's records and affirmed Dr. Haskins's assessment. (Tr. 100-02).

11

In March 2017, Mr. Tudhope completed a medical source assessment form. (Tr. 591-93). He indicated Plaintiff could perform the following activities, but with "noticeable difficulty (distracted from job activity) 11-20 percent of the work day or work week": remember locations and work-like procedures; understand, remember, and carry out short, simple, instructions; make simple work-related decisions; ask simple questions or request assistance. (Tr. 591). She could perform the following activities, but with "noticeable difficulty (distracted from job activity) more than 20 percent of the work day or work week": understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; sustain ordinary routine without special supervision; work in coordination with or proximity to others without being distracted; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting, be aware of normal hazards and take normal precautions; set realistic goals and make plans independently of others. (Tr. 591-92). Mr. Tudhope opined Plaintiff was unable to: complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace; respond appropriately to criticism from supervisors; get along with coworkers; or travel in unfamiliar places or use public transportation. *Id.* Mr. Tudhope estimated Plaintiff would miss more than four days of work per month, and be off-task for over twenty percent of an eight-hour workday. (Tr. 592). He opined she would need more than four unscheduled breaks per day for an "unknown" time period. *Id.* Mr. Tudhope did not answer the questions: "What are the medical findings which support your opinions?" and "Please discuss any other information that you believe would be relevant to a decision regarding whether or not this patient can maintain full-time employment." (Tr. 592-93).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 67-71). The ALJ first asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience, with the RFC as ultimately determined by the ALJ. (Tr. 67-68). The VE responded that such an individual could not perform past work, but could perform other jobs such as routing clerk, housekeeping cleaner, and marker. (Tr. 68-69). The VE also testified that the maximum job tolerance for time off-task is approximately 15% of the day, and maximum tolerance for absenteeism is one day per month on a regular basis. (Tr. 69). The ALJ and Plaintiff's counsel also asked additional hypothetical questions. (Tr. 69-71).

ALJ Decision

In his August 2, 2017 written decision, the ALJ found Plaintiff met the insured status requirements for DIB through June 30, 2019, and had not engaged in substantial gainful activity since her alleged onset date. (Tr. 20). The ALJ found Plaintiff had severe impairments of: degenerative disc disease of the lumbar spine, depressive disorder, anxiety disorder, and alcohol and substance abuse. *Id.* However, the ALJ concluded that none of these impairments – individually or in combination – met or medically equaled the severity of a listed impairment. *Id.* The ALJ then set forth Plaintiff's residual functional capacity ("RFC"):

> I find that the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations. The claimant can frequently climb ramps and stairs, and can occasionally climb ladders, ropes, and scaffolds. The claimant can frequently stoop, kneel, crouch, and crawl. The claimant cannot work at unprotected heights or near moving mechanical parts. The claimant can occasionally operate a motor vehicle as part of a job. The claimant can perform simple, routine tasks but not at a production rate pace. The claimant can make simple, work-related decisions. The claimant can tolerate occasional interactions with supervisors and coworkers, but cannot interact with the public. The claimant can tolerate few changes in a routine work setting, being infrequent changes that are explained in advance.

13

(Tr. 23). The ALJ concluded Plaintiff could not perform her past relevant work, but given her age, education, and experience, could perform other jobs that exist in significant numbers in the national economy. (Tr. 27-28). Therefore, the ALJ found Plaintiff not disabled. (Tr. 28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

14

Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises three objections to the ALJ's decision: 1) the ALJ did not properly evaluate the opinion evidence; 2) the ALJ erred in his evaluation of Plaintiff's credibility; and 3) the ALJ's Step Five determination is unsupported. For the reasons discussed below, the undersigned recommends the ALJ's decision be affirmed.

RFC

Plaintiff's first two arguments are directed at the ALJ's RFC. A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). In formulating an RFC, an ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. 20 C.F.R. § 404.1529. An ALJ must also consider and weigh medical opinions. 20 C.F.R. § 404.1527.

The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d). In formulating the RFC, the ALJ is not required to adopt any physician's opinion verbatim. 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) ("An RFC is an 'administrative finding,' and the final responsibility for determining an individual's RFC is reserved to the Commissioner."); SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment."); Accordingly, the ALJ bears the responsibility for determining an RFC based on all the relevant evidence. *See* 20 C.F.R. § 404.1545(a)(3). This finding, like all other findings made by the ALJ, must be supported by substantial evidence. 42 U.S.C. § 405(g); *Walters*, 125 F.3d at 528.

*Opinion Evidence*

Plaintiff first presents what she describes as a "treating source" argument, citing 20 C.F.R. § 404.1527. Within her argument, Plaintiff objects to the ALJ's treatment of the opinions of Mr. Tudhope and Mr. Swanson. She also contends the ALJ erred in providing greater weight to the opinions of the non-examining State agency physicians than treating and examining sources.

16

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. An "acceptable medical source" includes "licensed physicians" and "licensed or certified psychologists." 20 C.F.R. § 404.1513(a)(1)–(2). Evidence from those who are "not acceptable medical sources" or "other sources", is "important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-3p, 2006 WL 2329939, at *2. Interpreting SSR 06-3p, the Sixth Circuit explained that "[o]pinions from non-medical sources who have seen the [Plaintiff] in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion in with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). By contrast, a treating provider who is an "acceptable medical source is subject to more stringent requirements, known as the treating physician rule. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242–43 (6th Cir. 2007) (citing SSR 96-2p, 1996 WL 374188)[5]; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "[I]f the opinion of the treating physician as to the nature and severity of a claimant's conditions is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record,' then it will be accorded controlling weight." *Rogers*, 486 F.3d at 242 (quoting *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2).

---

5. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply only to claims filed after March 27, 2017. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in 2015 and thus the ALJ applied – and the undersigned applies – the previous version of the regulations.

If a treating physician's opinion is not given controlling weight, the ALJ must provide "good reasons" as to the weight assigned. 20 C.F.R. § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR 96-2p, 1996 WL 374188, at *5).

*Mr. Tudhope*

Preliminarily, Defendant argues that Mr. Tudhope is not an "acceptable medical source" as defined by 20 C.F.R. § 404.1513(a), and thus his opinion is not subject to the "good reasons" requirement of the treating physician rule. (Doc. 15, at 9). Plaintiff does not respond directly, but continues to argue and cite case law regarding the treating physician rule. (Doc. 16, at 3). The undersigned finds Plaintiff has not demonstrated that Mr. Tudhope, a Psychiatric Mental Health Nurse Practitioner, is a "treating source" within the regulation's definition. See 20 C.F.R. § 404.1502; *see also McNamara v. Comm'r of Soc. Sec.*, 623 F. App'x 308 (6th Cir. 2015) (per curiam) (nurse practitioner is not acceptable medical source). Therefore, the ALJ's evaluation of his opinion is subject to the requirements of SSR 06-3p regarding "other sources".

In his decision, the ALJ evaluated Mr. Tudhope's opinion and explained:

> I give little weight to Mr. Tudhope's opinion statement because he provides no narrative explanation for the checked boxes in the opinion form he filled out, because those checked limitations do not strongly correspond in degree with the claimant's ability to focus on and complete a variety of simple tasks at the examination with Dr. Dallara, and because his checked-box limitations are not consistent with the claimant's presentations at various appointments with no overt signs of anxiety (e.g., 4F4-5).

(Tr. 27). The undersigned finds the ALJ's reasoning supported by substantial evidence.

First, the ALJ explained that Mr. Tudhope provided "no narrative explanation for the checked boxes." *Id.* This is a valid reason to discount an opinion. *See, e.g., Ellars v. Astrue*, 647 F. App'x 563, 566-67 (6th Cir. 2016) (finding ALJ "may properly give little weight" to a "checkoff form . . . that did not cite clinical test results, observations, or other objective findings") (internal quotation and citation omitted); *see also* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion . . . the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). Notably, Mr. Tudhope left blank the portion of the form that asked: "What are the medical findings which support your opinions?" and "Please discuss any other information that you believe would be relevant to a decision regarding whether or not this patient can maintain full-time employment." (Tr. 592-93).

Second, the ALJ noted Mr. Tudhope's opinion was inconsistent with Plaintiff's presentation at the consultative examination with Dr. Dallara. (Tr. 27); *see* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Dr. Dallara also noted that, although Plaintiff self-reported memory difficulties, she was able to count backwards from twenty to one, say the alphabet, and remember five digits forward and three backward. (Tr. 327). He stated there was no evidence on examination to suggest an impairment to persistence or pace and opined she could understand and apply instructions in a work setting consistent with low-average intellectual abilities. (Tr. 329). These findings contrast with Mr. Tudhope's opinion that Plaintiff would have significant difficulty with attention and concentration, ordinary routines, pace, and be unable to complete a normal workday and workweek. (Tr. 591-92).

Third, the ALJ noted Mr. Tudhope's opinion was inconsistent with other evidence of record, including "the claimant's presentations at various appointments with no overt signs of anxiety." (Tr. 27) (Tr. 317-18); *see* 20 C.F.R. § 404.1527(c)(4). In the cited record, at her physical consultative examination, Dr. Carter noted that Plaintiff "at this time, has not complained of having any said difficulty regarding her depression and anxiety, although she states that this is worse than the sciatica. On examination, she was emotionally stable with a normal affect." (Tr. 317). Additionally, Dr. Dallara noted Plaintiff "did not display overt signs of anxiety such as fidgeting or trembling" (Tr. 327) and that "[e]xcept for brief tearfulness, the claimant made an essentially unremarkable social presentation during the examination" (Tr. 329). Furthermore, this finding is supported by other evidence in the record that Plaintiff presented without such overt signs of anxiety. *See* Tr. 541, 543, 545, 547 (Dr. Machado, 2016 – no acute distress, and "pleasant"); Tr. 491, 521, 560 (May, July, and December 2016 – normal affect); Tr. 535 (September 2016 – euthymic mood).

Although Plaintiff is certainly correct that she was also assessed with a depressed or anxious mood frequently, *See* Doc. 12, at 13 (citing Tr. 297, 335, 340, 343, 346, 387, 392, 397, 539, 586), even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. And, as the ALJ discussed elsewhere, although Plaintiff presented at the hearing "as very anxious and tearful . . . this presentation at the hearing was notably more severe than a great majority of her presentations at medical appointments, documented in the record." (Tr. 25). That is, even though Plaintiff presented with an anxious mood, the ALJ reasonably found that the documentation, even from Mr. Tudhope, did not support the extreme levels of limitation to which he opined. Additionally, although Mr.

Tudhope repeatedly documented an anxious mood, he did not list overt signs of anxiety in his notes. *See* Tr. 343, 396, 391, 387, 534.

Furthermore, the ALJ carefully tailored the RFC to Plaintiff's specific limitations that he reasonably found supported by the record:

> [T]his presentation at the hearing was notably more severe than a great majority of her presentations at medical appointments, documented in the record. At counseling sessions at Portage Path Behavioral Health and at a consultation with Dr. Robert F. Dallara Jr., Ph.D., the claimant has presented as calm, cooperative, with good eye contact, and with no overt signs of anxiety (e.g., 3F2, 5F4). These multiple, unremarkable presentations throughout the record do not corroborate her presentation at the hearing, and provide some indication that the claimant's presentation at the hearing is not indicative of her average behavior and mood when outside of her home (see 3F2, 5F4). That said however, I do find that the claimant cannot interact with the public as part of a job because of her anxiety, given that interactions with the public tend to be unfamiliar and less predictable than those with supervisors and coworkers. Given the less anxious and less tearful presentations in the record however, I do find the claimant can still tolerate occasional interactions with supervisors and coworkers, as she would have opportunity to become familiar and more comfortable with such persons over time.

(Tr. 25).

And, although Plaintiff accuses the ALJ of "playing doctor", and cherry-picking the record to support his conclusions, the undersigned disagrees. The "cherry-picking" argument is frequently made but seldom successful because, the Sixth Circuit has explained, "the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009); *accord DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (noting that "cherry picking" allegations are seldom successful because crediting them would require courts to re-weigh record evidence). The Sixth Circuit has consistently upheld the discretion vested in ALJs to weigh conflicting record evidence in assessing disability status. *See, e.g., White*, 572 F.3d at 284. Here, Plaintiff has not "persuasively shown that the ALJ erred in conducting [the] difficult task" of weighing the record evidence. *Id.*

Finally, within the treating source argument, Plaintiff presents an argument regarding the ALJ's consideration of Plaintiff's April and October 2015 hospitalizations. (Doc. 16, at 16). She describes the records, and then states, without further explanation, "[t]his conclusion disregarding two psychiatric hospitalizations in 2015, therefore, should be considered reversible error." *Id.* The undersigned finds no error. The ALJ explained that he did not "draw much persuasive inference" from the October 2015 hospitalization with psychotic symptoms "because the claimant tested positive for methamphetamines upon admission, suggesting a non-depression, non-anxiety based explanation for her visual hallucinations at this time." (Tr. 25). At the October visit for hallucinations, Plaintiff reported she had not been on any illicit drugs for six to eight months, however, she tested positive for amphetamines and "state[d] she doesn't know how she tested positive". (Tr. 449). Plaintiff was assessed with psychosis, not otherwise specified, rule out substance-induced psychosis, depressive disorder, not otherwise specified, anxiety disorder not otherwise specified, rule out PTSD, and polysubstance abuse. (Tr. 451). Upon discharge, she was diagnosed with psychosis not otherwise specified, anxiety disorder not otherwise specified, and polysubstance abuse. (Tr. 440). The ALJ's interpretation of this record – suggesting the hallucinations were likely drug-induced, rather than related to anxiety, is a reasonable one and is further supported by Plaintiff's later report to Mr. Tudhope that "she was only smoking weed—possibly laced weed". (Tr. 396). Although the ALJ did not discuss the April 2015 hospitalization, to the extent Plaintiff asserts this is in itself error, the undersigned notes "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. Appx 496, 508 (6th Cir. 2006). Notes from that hospitalization suggest Plaintiff's abnormal behavior might be drug induced. (Tr. 464). To the extent there is conflicting evidence, it is the ALJ's duty to resolve such conflicts. *See*

*Walters*, 127 F.3d at 531 (ALJ has duty to "weigh all of the evidence" and resolve any "significant conflicts" in the record).

Therefore, the undersigned finds the ALJ's decision to discount Mr. Tudhope's opinion, and the mental RFC as a whole, is supported by substantial evidence.[6]

*Mr. Swanson*

As with Mr. Tudhope, Mr. Swanson is not an "acceptable medical source" under the regulations. *See* 20 C.F.R. § 404.1513(a)(1)-(2); *see also Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 248-49 (6th Cir. 2015) (physical therapist is non-acceptable medical source). Moreover, he is not a *treating* source, as he only examined Plaintiff on one occasion. *See* 20 C.F.R. § 404.1502 (defining treating source as one who "provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you").

Preliminarily, the Commissioner argues Plaintiff has waived any argument as to Mr. Swanson's opinion, because "[w]hile Plaintiff briefly mentions [this] opinion in her brief, she provides no argument to support her claim that the ALJ erred in rendering his decision." (Doc. 15, 1 9). The Commissioner is correct that underdeveloped arguments are waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Plaintiff argues in Reply that because Mr. Swanson report was "completed as part of Dr. Machado's records, it should have been accorded greater weight." (Doc. 16, at 2). But Plaintiff points to no indication that Dr. Machado signed Mr. Swanson's findings, or otherwise indicated agreement with them. *Cf., e.g., Borden v. Comm'r of Soc. Sec.*, 2014 WL 7335176, at *9 n.2 (N.D. Ohio) (finding that an opinion signed by both a nurse practitioner and a physician may qualify as a treating physician's opinion where there is evidence

---

6. Even if Mr. Tudhope qualified as an "acceptable medical source" subject to the more stringent requirements of the treating physician rule, the undersigned would find the ALJ had satisfied the regulatory "good reasons" rule for the same reasons discussed above.

the opinion is a "team effort"). Rather, Mr. Swanson's evaluation simply bears Dr. Machado's name as Plaintiff's treating physician. *See* Tr. 481-86. But this notation does not convert the findings of a physical therapist into the findings of a treating physician.

The ALJ explained his consideration of Mr. Swanson's opinion:

> I give little weight to Mr. Swanson's opinion because the stated restrictions are inconsistent in degree with the only mild nature of degenerative disc disease shown to be affecting the claimant's lumbar spine at L5-S1 (e.g., 1F4). Furthermore, Mr. Swanson based his opinion on a one-time functional capacity evaluation examination, and did not have the opportunity to review the entirety of the medical evidence present in the file, being evidence that shows the claimant to have greater strength and exertional tolerance than Mr. Swanson has described (e.g., 8F15, 4F4).

(Tr. 26). The undersigned finds this supported by substantial evidence. As the ALJ thoroughly explained elsewhere in his decision, and as is discussed further below in the subjective symptom section, substantial evidence of record supported less limiting physical limitations than Plaintiff alleged and Mr. Swanson found. As such, there is no error. Because Plaintiff presents no further argument on this point, the undersigned need not address it further.

*State Agency Opinions*

Plaintiff also argues the ALJ erred in assigning greater weight to the State agency reviewing opinions than to those who examined or treated Plaintiff. She also contends the ALJ erred in relying on such opinions when these sources did not have the opportunity to review the entire record. But neither of these things is *per se* error, nor did the ALJ err in this case. State agency physicians are "highly qualified physicians, psychologists, and other medical specialists who are experts in the evaluation of medical issues in disability claims[.]" SSR 96-6p, 1996 WL 374180, at *2. "In appropriate circumstances, opinions [from non-examining sources] may be entitled to greater weight than the opinions of treating or examining sources." *Id.* at *3; *see also Mitchell v. Comm'r of Soc. Sec.*, 330 F. App'x 563, 568 (6th Cir. 2009). Furthermore, an ALJ does

not err in relying on a State agency physician's opinion even when that physician has not reviewed the entire record, so long as the ALJ considers the post-dated evidence in formulating his opinion. *See, e.g., McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009)

Substantial evidence supports the ALJ's determination here. As the ALJ explained, he found these opinions were consistent with the record as a whole. (Tr. 25-26). Moreover, the ALJ's decision reflects that he considered evidence presented subsequent to the State agency physicians' opinions in formulating the RFC. *See* Tr. 20-27. As such, the undersigned finds no error in the ALJ's analysis of the opinion evidence.

*Credibility / Subjective Symptom Analysis*

Plaintiff next argues the ALJ erred in his evaluation of her subjective symptoms/credibility. The Sixth Circuit has recognized that pain alone may be disabling. *See King v. Heckler*, 742 F.2d 968, 972 (6th Cir. 1984). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. §§ 404.1529(a); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800–01 (6th Cir. 2004) (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

When a claimant alleges impairment-related symptoms, an ALJ must follow a two-step process to evaluate those symptoms. 20 C.F.R. § 404.1529; SSR 16-3p, 2017 WL 5180304, *2-8.[7] First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 2017 WL 5180304, *3-4. Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those symptoms limit the claimant's ability to perform work-related activities. *Id.* at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. *Id.* at *5-8. In addition to this evidence, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1529(c)(3). *Id.* at *7-8. Those factors include: daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c). Although the ALJ must "consider" the listed factors, there is

---

7. SSR 16-3p replaced SSR 96-7p and applies to ALJ decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. The ALJ's decision here is dated August 2, 2017 and thus SSR 16-3p applies. In March 2016, the Social Security Administration issued new Social Security Ruling 16-3p, which eliminated "'the use of the word 'credibility' . . . to 'clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (quoting SSR 16-3p). Both SSR 96-7p and SSR 16-3p direct the ALJ to evaluate an individual's subjective report of symptoms with the factors listed in 20 C.F.R. § 404.1529. SSR 16-3p, 2017 WL 5180304, at *7; SSR 96-7p,1996 WL 374186, at *2.

no requirement that she discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The Sixth Circuit has explained (interpreting SSR 96-7p) the precursor ruling, that a credibility determination will not be disturbed "absent compelling reason", *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and such determinations are "virtually unchallengeable", *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal quotation omitted). The Court is thus limited to determining whether the ALJ's reasons are supported by substantial evidence. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]."). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ in this case followed the above-described two-step process, and the undersigned finds no "compelling reason", *Smith*, 307 F.3d at 379, to disturb his subjective symptom evaluation. Read as a whole, the ALJ's decision contains thorough, well-articulated, and supported reasons for discounting Plaintiff's subjective symptom statements. *See* Tr. 23-25. Indeed, in almost every paragraph on these three pages of his decision, the ALJ compared Plaintiff's testimony to the record and explained his reasoning for finding it inconsistent. *See id.*

As to Plaintiff's physical limitations, the ALJ cited inconsistencies in the record. First, he explained that the objective medical findings "on their face are generally inconsistent with the acute pain and fatigue levels the claimant has described". (Tr. 24). This is supported by the record. *See* Tr. 288 (MRI showing mild degenerative changes); Tr. 319 (x-rays showing mild degenerative

27

changes). Second, he cited inconsistent records of gait difficulty, explaining that it "suggest[ed] some lower back pain, but not the degree of pain the claimant has alleged because she has shown a continued ability to bear her own weight and generally ambulate freely without use of any assistive device." *Id.* This is supported by the record. *See* Tr. 317 (gait "without ataxia"); Tr. 327 ("slightly impaired gait"); Tr. 358 ("able to ambulate in the examination room" despite hip and back pain); Tr. 547 (notation of ambulation without difficulty); Tr. 481 ("gait with antalgia noted favoring the right side"); Tr. 427 ("ambulatory"); Tr. 520 (normal gait); Tr. 491 (normal gait); (Tr. 371) ("limping" gait, favoring the left leg). Furthermore, the ALJ noted Plaintiff lived in a house with sixteen stairs demonstrating "a residual ability to frequently climb stairs and ramps, despite her lower back complications." (Tr. 24) (citing Tr. 316). Third, the ALJ pointed to the documentation of full strength, no atrophy, and negative straight leg raises to support his decision to find Plaintiff less limited than she alleged. (Tr. 24). This, again, is supported by the record. *See* Tr. 317 (full lower extremity strength and negative straight leg raise); Tr. 371 (negative straight leg raise and full strength in both legs.); *see also* Tr. 437 (full strength in lower extremities, negative straight leg raising); Tr. 506 (normal back range of motion and no back tenderness); Tr. 543 (normal musculoskeletal examination). The ALJ then summarized his reasoning:

> These signs all tend to suggest lower levels of lumbar pain than the claimant described because they evidence relatively normal physical functioning. The absence of any atrophy in the lower extremities or lower back is particularly inconsistent with the claimant's testimony that she has spent a great majority of the last four years isolating in her bedroom. If this were the case, one would reasonably expect to find increasing signs of muscular atrophy in the treatment record. That the record does not reflect such signs provides some indication that the claimant has been more active than described in her hearing testimony.

(Tr. 24). This complies with SSR 16-3p. 2017 WL 5180304, at *6 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we

28

will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").

The ALJ similarly cited inconsistencies between Plaintiff's testimony and the record regarding her mental health impairments. *See* Tr. 25. As discussed in detail above, the ALJ compared Plaintiff's presentation at the hearing (with significant signs of anxiety) to other records suggesting less severe impairment. *See id.* He also clearly explained his reasons for imposing some (significant) mental limitations in the RFC but not others. *See* Tr. 23 (RFC including simple, routine tasks, not at production rate pace; simple work-related decisions; occasional interactions with supervisors and coworkers; no interaction with the public; few changes, meaning infrequent changes explained in advance); *see also* Tr. 25 (explaining rationale for various restrictions). Again, this is in accord with SSR 13-3p. 2017 WL 5180304, at *6 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). The ALJ's decision "contain[s] specific reasons for the weight given to the individual's symptoms, [is] consistent with and supported by the evidence, and [is] clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." 2017 WL 5180304, at *10. As such, there is no error.

Again, the undersigned certainly recognizes that there are indications in the record that Plaintiff is more limited than the ALJ found. But this Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. For the reasons discussed above, substantial evidence supports the ALJ's RFC determination (including the analysis of opinion evidence and analysis of Plaintiff's subjective symptoms).

Step Five

Plaintiff frames her final argument as a "Step Five" argument. To meet the burden at Step Five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id*. If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010). However, an ALJ is only required to include in the RFC those restrictions he finds credible and supported. *Irvin v. Social Sec. Admin.*, 573 F. App'x 498, 502 (6th Cir. 2014) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Plaintiff argues the Step Five determination is this case is not supported because "the RFC in the decision did not include the fact that she was unable to have contact with co-workers as contained in the second hypothetical question." (Doc. 12, at 22). This question, Plaintiff asserts, is the one that accurately reflected her abilities. *See* Doc. 16, at 3-4. But the ALJ disagreed, and, as discussed above, his decision in that regard is supported by substantial evidence. As the Sixth Circuit explained in a recent decision:

> [Plaintiff's] argument confuses the roles of the ALJ and the vocational expert. The vocational expert "d[oes] not determine what restrictions claimant in fact had." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 247 (6th Cir. 1987). Instead, it is the ALJ's role to "determine what medical restrictions claimant was under and how they affected his residual functional capacity, and then to determine whether the vocational expert had identified a significant number of jobs in a relevant market given these restrictions." *Id.*
>
> As [Plaintiff] notes, a vocational expert's answer to a hypothetical question serves as substantial evidence of the claimant's disability (or lack thereof). *See, e.g., Ealy*

*v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). But that rule applies *only if* the ALJ's question "accurately portray[s] a claimant's physical and mental impairments," *id.* (citing *Howard v. Comm'r v. Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)), and the ALJ need not identify the claimant's precise limitations before posing hypothetical questions to the vocational expert. *Maziarz*, 837 F.2d at 247; *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 730 (6th Cir. 2013).

Indeed, the ALJ may pose a question involving a hypothetical individual with several limitations— and then later decide that those limitations differed from the claimant's limitations. *See, e.g.*, *Maziarz*, 837 F.2d at 247. That does not mean that the vocational expert's answer about the *hypothetical individual* binds the ALJ. To the contrary, the ALJ may well conclude that the vocational expert's answer is irrelevant to whether there are jobs in the national economy that the *claimant* can perform. *Id.* To hold otherwise would effectively eliminate the ALJ's ability to ask any questions about a hypothetical individual unless he had identified the exact contours of the claimant's disability by the time of the hearing.

*Kessans v. Comm'r of Soc. Sec.*, No. 18-5831, slip op. at 7-8 (6th Cir. April 16, 2019).

Because the undersigned finds the ALJ's RFC in this case is supported by substantial evidence, and the first hypothetical question posed to the VE (Tr. 67-68) matches the RFC (Tr. 23), there is no Step Five error.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and recommends the decision be affirmed.

  s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

31